UNITED STATES DISTRICT COURT
DISTRICT OF MAINE


| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.      ) | Docket No. 2:19-cr-000149-003 |
| ) | |
| NATHANIEL RIVERA    ) | |
| ) | |


**DEFENDANT'S SENTENCING MEMORANDUM**

**NOW COMES** Defendant Nathaniel Rivera, by and through his counsel, Amy L. Fairfield, and hereby submits this sentencing memorandum in support of Defendant's position regarding sentencing. In support of this request Defendant states the following:

**BACKGROUND**

On February 18, 2020 Defendant pleaded guilty to a Superseding Indictment before the Honorable Jon D. Levy, Chief Judge, United States District Court to one count of Conspiracy to Commit Hobbs Act Robbery in violation of 18 U.S.C. Sections 1951(a). A presentence conference was held June 15, 2020 and, because of the novel Coronavirus, sentencing in this matter is not yet scheduled.

**1.      Summary of Position**

The Guideline range for Nathaniel according to the PSR is 151 to 188 months of incarceration on the single count Indictment. We ask the Court to sentence Nathaniel to the

variant guideline sentence of 60 months, three years of supervised release along with all of the other recommended special conditions. A sixty-month period of incarceration is "sufficient but not greater than necessary" based on application of the sentencing factors set out in 18 U.S.C. §3553(a) and in particular, the characteristics of the offender.

2.   **Agreement for Purposes of Sentencing**

Pursuant to a plea agreement, the parties agree that Defendant shall not have a right to appeal any sentence that does not exceed sixty months.

3.   **Pre-Sentence Report and Advisory Guidelines**

The aforementioned PSR, establishes an offense level of 31 and a criminal history category of IV, with an advisory Guideline range of 151 to 188 months on the single count of the Complaint.

Nathaniel will also be obligated to pay restitution in this matter. Although unclear as to the exact amount of money he will have to pay for his portion of monies needed to make the victim financially whole, Nathaniel is willing to pay whatever sum of money this Honorable Court Orders him to pay. Nathaniel does not have sums of money available to immediately pay restitution, but he has a demonstrated work ethic and is deeply remorseful for his actions and will endeavor to pay the victim in this matter as much as he can as quickly as he can.

4.   **Nathaniel Rivera**

Nathaniel Rivera was born to Audrey Rivera and Michael Rivera on June 5, 1991; he is 29 years old. His parents separated when Nathaniel was about two, and despite Michael living in the same town throughout Nathaniel's formative years, Nathaniel never really had a relationship with his father. Nathaniel has five half-sisters, two paternal and three maternal. He also has two

nieces, Annaleisse (age 14) and Anyah (age 6) who are the biological children of his sister Nina who has unfortunately struggled with addiction for many years. Consequently, Annaleisse and Anyah live with Nathan's mother, Audrey in Tewksbury. Annaleisse is handicapped and, as a result, is relegated to a wheelchair. Audrey does her best to care for both girls but is limited in what she can do, and she relies upon Nathaniel for assistance, which he provides happily and willingly. Nathaniel is very close to both of his nieces but has a special bond with Annaleisse, likely in part because, as his mother says, Nathaniel has always rooted for the underdog. Ever since Nathaniel was a school-aged boy, according to Audrey, he was always trying to protect those who did not have the ability to protect themselves. Whether it was scrapping on the elementary school yard or trying to assist another in preparation for a Math test, Nathaniel has always had a weak spot for those who seemingly had no voice. Audrey recalled one birthday party of Nathaniel's when he was permitted to have six friends to his house for his ninth or tenth birthday party. Half of the children Nathaniel asked to attend were kids Audrey did not recognize, but rather were children who Nathaniel wanted to make sure had friends. He made sure each had fun and also had plenty to eat, and that they felt they had friends.

      These kind gestures are a hallmark of Nathaniel's huge heart and his love of people. Annaleisse is 14 years old and has a hard time doing simple tasks as she has very little use of her legs. Since Nathaniel is able to lift Annaleisse, she is able to enjoy activities that she otherwise would not. Nathaniel takes her to fairs, amusement parks, swimming at local pools, the beach, movies, concerts, as well as to many other activities Annaleisse loves to do. For the brief period of time Nathaniel was incarcerated on this charge, Annaleisse really struggled. She was sad and confused as to why she did not see her uncle each day. Audrey described that when Nathaniel

was able to come home on Pretrial supervision, Annaleisse was incredibly happy to see her uncle and "began smiling again."

Nathaniel struggled through school; although good with all hands-on tasks, he had to work harder than most on basic reading and writing assignments. Socially, Nathaniel also had troubles, as he was often teased by his classmates making school painful to attend and easy to be distracted. As his mom explained, he was a "wise guy," which likely masked his insecurities surrounding academics and relationships with his peers.

From the onset of his early teens, Nathaniel was coaxed by most all of his friends and peers to affiliate with and join gangs, but steadfastly and methodically resisted all temptation and pressure to wear colors, rather he tried to remain neutral "---like Switzerland." Nathaniel described that he believed his neutral position allowed him to try to negotiate peaceful solutions in an effort to quell overall violence. He also did not care for the senseless acts of violence that gangs often perpetrated against property, and especially people.

Despite his peace-keeping efforts, unfortunately, Nathaniel found himself in a fair amount of trouble at a very young age. When he was 18, Nathaniel vandalized a number of gravestones while he was intoxicated. Although an absolutely senseless act of stupidity and mindless desecration, Nathaniel can only describe that he was bitterly angry, and cannot really pinpoint the exact genesis for his terrible outburst. He states that he knew he was upset with his father raising his sisters, but not wanting anything to do with him, his only son. Looking back, I think—I'm sure I was acting out. I was mad at my father who never loved me or cared about me. I sure did love him and wish things were different though."

Nathaniel also describes his father's other love as being Heroin. Although young, Nathaniel was keenly aware of his father's rampant and prolific drug abuse describing how he

remembers classic indicia of heroin abuse with his father nodding off, but then a short time later, having much more energy and "seeming fine." He also describes hopelessness sin the fear his father would die prematurely and that made him feel guilty thinking he should try harder to make his dad love him.

Nathaniel's mom, Audrey, is his rock. Although they did not have much while Nathaniel was growing up, Audrey worked two jobs to try to provide for four children, Nathaniel and his three half-sisters. Today, Nathaniel is the one who is looking out for his mom. While being on Pretrial, Nathaniel has worked to keep all of his own bills paid and has also assisted his mother with car repairs and household bills. Additionally, he pays for many of his niece's needs such as food, activities they like to participate in and clothing his mother could not otherwise afford.

A short time later, Nathaniel was arrested and convicted of trafficking in drugs and received a prison sentence. Although not a drug user himself, Nathaniel describes being attracted to a lifestyle his family could never afford, and used the ill-gotten proceeds to help his mother, his grandmother, his nieces, and his friends with bills and other needs and some wants. Nathaniel describes deriving a lot of joy from doing for others but has huge regrets about his methods for getting the money to share with friends and family.

Historically, Nathaniel has worked many under the table jobs, however since being arrested, he has tried to focus on earning money through employment that is on the books and taxed. He has attended and completed two semesters of electrical curriculum at Community College and has worked for companies within that field. He has become a cherished and valued employee and his employers describe him as "hard working, dedicated and reliable."

Nathaniel has also found companionship in a good and healthy relationship with Destiny Perez. The two enjoy exercising and responsible outings. Ms. Perez is in the mental health field

and, on more than one occasion has lent Nathaniel advice and has even suggested the names of individual counselors to help him cope with all he has going on his life. By all accounts, Ms. Perez is a very positive person in Nathaniel's life.

"I have made a lot of mistakes and I have taken this time to change, really change. I am proud of the work I have done and the good changes I have made in myself.  I am ready for the new day and am going to be much, much different."

## ARGUMENT

**I.  When Taking Into Account The Factors Listed In 18 U.S.C. § 3553, This Court Must Impose A Variant Sentence.**

18 U.S.C. § 3553 governs the factors that the Court must consider when imposing a sentence upon any Defendant.  When reviewing the individual factors elucidated in § 3553(a)(2)(A-D) and aligning those factors with the particular facts of this case and the individual characteristics of this Defendant it appears clear that a deviant sentence can and should be imposed.  In the wake of *United States v. Booker*, the Sentencing Guidelines are now only a single factor among many that the Court considers when imposing sentence.  125 S.Ct. 738, 757 (2005).  The Court must also review and consider the factors contained in 18 U.S.C. § 3553 when imposing sentence so that the sentence imposed is "sufficient, but not greater than necessary" in light of the factors listed in subsection 2 of the statute. *Id.*

As noted above, since the decision in *Booker,* sentencing courts must now look at all of the factors enumerated under 18 U.S.C. § 3553(a) when determining an appropriate sentence.  *Id*. As such the determination of a sentence becomes a matter within the discretion of the sentencing

court so long as the statutory factors are considered, and the sentence falls within the range determined by the statute. *See United States v. Brown,* 450 F.3d 76, 81-82 (1st Cir. 2007) *United States v. Moore*, 2007 U.S. Dist. LEXIS 43288 at 2. The range of sentences available to the sentencing Court in this case is between no jail time and up to 20 years. Thus, there is no mandatory minimum involved with this conduct. The Sentencing Guidelines now carry no more or less weight than any of the other factors outlined in 18 U.S.C. § 3553(a) and it is inappropriate to give them any presumptive weight in determining a sentence. *Brown*, 450 F.3d at 81-82. Looking generally at Section 3553(a) and the specific factors described in 3553(a)(2) that are involved in the Court's analysis in determining the Defendant's sentence, Defendant avers that a variant sentence is appropriate in this matter.

The Supreme Court stated in *Pepper v. United States* that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" 562 U.S. _____ (2011) quoting *Koon v. United States*, 518 U.S. 81, 113, 116 S. Ct. 2035, 135 L. Ed. 2d 392 (1996)). Court's need not adhere to the rigidity of the Sentencing Guidelines. *United States v. Booker*, 543 U.S. 220 (2005).

A variant sentence is appropriate in this matter based on the application of the sentencing factors in 18 U.S.C. §3553(a) which provides in pertinent part:

> "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The Court, in determining the particular sentence to be imposed shall consider-

*(1) the nature and circumstances of the offense and the history and characteristics of the defendant;*

*(2) the need for the sentence imposed—*

*(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;*

*(B) to afford adequate deterrence to criminal conduct;*

*(C) to protect the public from further crimes of the defendant; and*

*(D) to provide the defendant with needed educational or vocational training,*

The United States Supreme Court held that it is impermissible to presume that the Sentencing Guidelines are reasonable. *Nelson v. United States,* 555 U.S___ 129 S.Ct. 890 (2009).

A. **A Sentence of 60 Months Incarceration is Appropriate Based on the History and Characteristics of Nathaniel.**

 1. Variant Factor – Collateral Consequences of a Conviction

Nathaniel is aware that he engaged in unlawful activities and such behavior leads to serious and deserved consequences. He was aware of this from the time that he relinquished his Constitutional right to a trial and agreed to accept responsibility for his actions by pleading guilty to an Indictment as charged, saving the government the time and expense associated with a trial in this matter. He is also aware that his actions will have consequences that will remain with him for the rest of his life.

There are nationwide nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons. See *generally* American Bar

Association, Nat'l Inventory of the Collateral Consequences of Conviction, abacollateralconsequences.org; see also How to Get Around A Criminal Conviction, N.Y. TIMES, at A22 (Oct. 19, 2015) ("{s}ome 70 million to 100 million people in the United States-more than a quarter of all adults-have a criminal record, and as a result they are subject to tens of thousands of federal and state laws and rules that restrict or prohibit their access to the most basic rights and privileges-from voting, employment and housing to business licensing and parental rights."). The First Circuit has not ruled on whether collateral consequences of a conviction may be a factor in a request for a variance. But the Second and Fourth Circuits both held it can. See *United States v. Stewart*, 590 F.3d 93, 141-2 (2d Cir. 2009)( "{i}t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."); see also *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007).

      The specific consequences to Nathaniel are warranted and immeasurable. Under 42 U.S.C. § 13661 and 24 C.F.R. §5.855, he may be denied admission to federally assisted housing for a "reasonable time." These enumerated factors are in addition to the daily general consequences and scorn from society for convicted drug felons including the fact that convicted felons are less likely to be hired for general employment. See *Ex-Offenders and the Labor Market*, U.S. Center on Economic and Policy Research, (2010)(finding that a felony conviction significantly reduces the ability of ex-offenders to find jobs, costing the U.S. economy an estimated $57 to $65 billion annually in lost economic output). http://cepr.net/documents/publications/ex-offenders-2010-11.pdf. This is of particular concern where Nathaniel is young and will hopefully have years in the workforce ahead of him. See *United States v. Gardellini*, 545 F.3d 1089 (DC Cir. 2008)(upholding non-guidelines sentence of

probation and a fine for defendant convicted of filing false tax returns where guidelines range was 10-16 months because defendant had accepted responsibility, a minimal -65- risk of recidivism, had already suffered substantially and been treated for stress, and the only real deterrent in these cases are the efforts of prosecutors to enforce the laws, not harsh prison sentences).

It is also of concern in that Nathaniel wants to continue his schooling and likely, cannot receive any grants or assistance for a significant, if not indefinite period of time.

### 2.  Variant Factor-Childhood of Nathaniel

There is little doubt Nathaniel experienced a disadvantaged childhood, which likely helped to put him on the path that brought him before the court today. As outlined in the PSR, Nathaniel's father had no interest in being Nathaniel's father. And what made matters worse, Nathaniel's father was a "great dad" to his two half-sisters, which impacted Nathaniel more profoundly than he realized.

There can be no question these dysfunctional early childhood experiences that continued throughout his adolescents were at the root of Nathaniel's behavioral problems in early adulthood and there is no indication that he ever received the intensive treatment that would be necessary to alter the significant anger issues and thinking errors that existed.  Courts have consistently considered childhood factors as a basis for a variance. *United States v. McBride*, 2007 WL 4555205 (11th Cir. Dec. 28, 2007) (finding non-guideline sentence of 84 months, a departure from a term of 151-188 was sufficient but not greater than necessary. Among the factors considered where the severe physical abuse defendant suffered and having been shuffled

between foster homes until adulthood); *United States v. Lopez*, 938 F.2d 1293, 1297-99 (D.C.Cir. 1991) (remanded for district court to consider a departure from 51 month sentence imposed in drug case because defendant was exposed to domestic violence as a child, his mother's murder by stepfather, his need to leave town due to threats, and having grown up in slums of New York and Puerto Rico ); *United States v. Ruiz*, 2009 WL 636543 (S.D. N.Y., March 11, 2009) (judge imposed 96 months rather than guideline range of 140-175 months for crack offenses in part due to defendant's difficult childhood with abusive mother and largely absent father who was incarcerated and a heroin addict, and the absence of any prior substance abuse assistance); *United States v. Samuels*, 2009 WL 875320 (S.D. N.Y. April 2, 2009) (time served imposed rather than guideline range of 70-87months for young woman from abused background who was embarrassed by her drug sales and did not tell her family though she sold them to support them); *United States v. Handy*, 2008 WL 3049899 (E.D.N.Y. 2008) (court imposed 30 month sentence rather than guideline range of 37-46 months for 20-year-old who was effectively abandoned as an infant and separated from siblings,); *United States v. Santa*, 2008 WL 2065560 (E.D. N.Y. 2008) (court imposed 120 months as a variance from a guideline term of 262-327 months for a mentally ill defendant based on difficult childhood and life); *United States v. Germosen*, 473 F. Supp. 2d 221 (D. Mass 2007) (where guideline range was 37-46 months for conspiracy involving heroin importation, a sentence of 2 years of probation with six months home confinement was warranted partly because defendant had dealt with and was prepared to overcome difficult circumstances of his youth).

In *United States v. Shift*, the district court departed ten months from the guideline range and imposed the mandatory minimum sentence, finding that defendant's lack of youthful guidance, and acceptance of responsibility indicated that ten additional months of incarceration

would serve no deterrent or retributive purpose to defendant or to general public. 2008 WL 2906884 (N.D.Ind. 2008). Perhaps no argument better summarizes the situation as it relates to Nathaniel. It is hard to imagine what would be gained by a longer sentence. One hundred and eighty-eight months instead of sixty months does not serve as a greater deterrence for Nathaniel, as he is ready to finish incarceration and lead a law-abiding life under the supervision offered by a period of supervised release.

In *United States v. Patzer*, the court imposed a sentence of 13 years despite a guideline range of 28 years taking into account the defendant's difficult childhood and that the defendant, like Nathaniel, was never properly treated for the tremendous grief and loss he felt by being abandoned by his father.

### a. **Defendant's Family Circumstances And Their Willingness to Support and Aid In His Rehabilitation Coupled With Defendant's Own Desire For Treatment Merit a Downward Variance From the Guideline Range.**

"A founded prospect of meaningful rehabilitation remains a permissible basis for a variant sentence under" the sentencing guidelines. *United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008). In *Martin* the defendant's 91 month downward variance from the guideline range was affirmed based in part on "the support that the defendant stood to receive from his family [and] personal qualities indicating his potential for rehabilitation. . ." *Id.* While incarcerated, after arrest and prior to sentencing, the defendant renounced his former ways and embraced a renewed commitment to religion and family. *Id.* at 94. Because his metamorphosis was combined with the reciprocal commitment exhibited by his family, the likelihood of meaningful

rehabilitation rose to a level meriting weight in the section 3553(a) analysis. *Id.* See, e.g. *United States v. Phinazee*, 515 F.3d 511 (6th Cir. 2008), *United States v. Grossman*, 513 F.3d 592 (6th Cir. 2008), *United States v. Gay,* 509 F.3d 1334 (10th Cir. 2007).

Nathaniel is motivated to engage in any treatment and/or programs that are required or suggested, and to follow recommendations from probation and this Honorable Court upon his release from imprisonment. Furthermore, Defendant's strong family support system including his girlfriend and her family and friends will undoubtedly help him through the process. As in *Martin*, Defendant should receive a downward variance based on the prospect of meaningful rehabilitation and the support he stands to receive from his family as well as Defendant's personal attitude toward treatment.

        b.      **Defendant's Exceptional Degree Of Remorse For His Actions Justifies A Significant Downward Variance From The Sentencing Guidelines.**

"A sentencing court may depart downward if remorse is present to an exceptional degree." *United States v. Stall*, 581 F.3d 276, 281 (6th Cir. 2009); *United States v. Fagan*, 162 F.3d 1280, 1284-1285 (10th Cir. 1998). In *Stall*, the 6th Circuit upheld a sentence of only one day of incarceration along with ten years of supervised release, a significant downward departure from the 57-71 months recommended by the Sentencing Guidelines. *Id.* at 277. Upon learning that he was suspected of downloading child pornography, the defendant immediately became "remorseful and distraught," confessed, and expressed a desire to obtain mental health treatment. *Id.* This variance was based in part on how remorseful the defendant was, the fact that he was undergoing treatment, and the fact that the treatment might be less effective in the prison context. *Id.* at 280-281, 289. The sentencing court considered the defendant's immediate expression of

remorse and empathy for the children harmed as a result of his crime to be a sufficient contributing factor warranting a downward variance. *Id* at 281.

In the present matter, Defendant has renounced his conduct that led him to this point and is completely remorseful for his actions. Upon his arrest, Defendant was cooperative and forthcoming about his actions. Once he fully realized the gravity of his actions, Defendant accepted responsibility and pleaded guilty to the Indictment. He is accepting of what he did, understands he could have harmed R.S. badly and has expressed deep remorse for his actions and behavior. Like the defendant in *Stall,* Defendant was immediately remorseful, admitted his conduct to the government and now seeks and is accepting of punishment and recommended treatment in order that he can make meaningful and lasting change.

Defendant continues to recognize and regret his actions for how they affected those who love him, as well as the potential danger he caused.  He also avers that he is no longer a danger to the public, given his commitment, and his unwavering support system, and the public need not be protected from additional criminal activity.  Defendant's remorse clearly rises to an exceptional degree warranting a downward departure as is evidenced by his willingness to cooperate, and commit to a new lifestyle, and the commitment those who know and love him have displayed.

**CONCLUSION**

As noted in Section 3553(a) "The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) . . . "  In addressing the need for an appropriate sentence Paragraph (2) (A) reads that a sentence should "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  In the instant case Defendant has fully acknowledged his culpability in the offense charged.  He recognizes that the offense was serious.  However, promoting respect for the law should not only be about punishment, but also for rehabilitation, particularly when it is done on a voluntary basis.  The final section of (2)(A) refers to "just punishment."  When analyzing these factors and taking into account that the Sentencing Guidelines are in fact only guidelines and only one factor of several in the sentencing analysis, this case is exactly the type of case that the *Booker* decision should affect in a very positive manner.

Defendant understands that a period of incarceration will be imposed.  However, the Guideline sentence of 151-188 months is excessive in his case.  Defendant's history and characteristics, especially his willingness to participate in whatever treatment is deemed appropriate coupled with his family support, and also his profound remorse, wiliness to cooperate with the government and acceptance of responsibility are all factors that allow for the Court to impose a sentence below the Sentencing Guideline range.  Based on the proposed departure and variances explained above Defendant's final sentence should be no more than 60 months followed by 3 years of supervised release, with the conditions outlined by Probation

Officer Belanger in the PSR. Defendant also requests the Court to recommend that he serve his time somewhere in New England so that he may be close to his family.

Dated: July 21, 2020                                  Respectfully Submitted,

                                                   /s/ Amy L. Fairfield
                                                  Amy L. Fairfield
                                                  Attorney for Defendant Nathaniel Rivera
                                                  Fairfield & Associates, P.A.
                                                  10 Stoney Brook Lane
                                                  Lyman, ME  04002
                                                  (207) 985-9465

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused notice of the foregoing **Sentencing Memorandum** to be served on the following parties via the CM/ECF electronic filing system:

Daniel Perry, AUSA
Office of the United States Attorney
100 Middle Street Plaza, East Tower
P. O. Box 9718
Portland, ME 04104


Dated: July 21, 2020                /s/ Amy L. Fairfield_____
                                    Amy L. Fairfield
                                    Attorney for Defendant Nathaniel Rivera
                                    Fairfield & Associates, P.A.
                                    10 Stoney Brook Lane
                                    Lyman, ME 04002
                                    (207) 985-9465