```
 1                  UNITED STATES DISTRICT COURT

 2                       DISTRICT OF MAINE

 3   _____

 4   UNITED STATES OF AMERICA,              CRIMINAL ACTION

 5              Plaintiff            Docket No:  2:19-149-JDL-3

 6

 7       -versus-

 8                                      PARTIAL TRANSCRIPT

 9

10   NATHANIEL RIVERA,

11              Defendant
     _____

12                    Transcript of Proceedings

13

14   Pursuant to notice, the above-entitled matter came on for
     Sentencing held before THE HONORABLE JON D. LEVY, United
15   States District Court Judge, in the United States District
     Court, Edward T. Gignoux Courthouse, 156 Federal Street,
16   Portland, Maine, on the 7th day of July 2021 at 11:22 a.m. as
     follows:
17

18   Appearances:

19   For the Government:   Daniel J. Perry, Esquire
                           Assistant United States Attorney
20
     For the Defendant:  Amy L. Fairfield, Esquire
21
     Also Present:  Heather Belanger, U.S. Probation
22

23              Lori D. Dunbar, RMR, CRR
                Official Court Reporter
24
                (Prepared from manual stenography and
25                  computer aided transcription)
```

```
 1              (Open court.  Defendant present.)

 2         THE COURT:  Good morning.  We are now proceeding in

 3    the matter of United States versus Nathaniel Rivera.  It's

 4    Docket No. 19-CR-149.  Counsel, please note your appearances

 5    for the record.

 6         MR. PERRY:  Good morning, Your Honor.  Daniel Perry

 7    for the United States.

 8         THE COURT:  Good morning.

 9         MS. FAIRFIELD:  Good morning, Your Honor.  Amy

10    Fairfield for Mr. Nathan Rivera.

11         THE COURT:  Good morning, thank you.  Members of the

12    public who are present today, I want to remind you of the

13    Court's requirement that people remain six feet physically

14    distant.  If you've arrived together as a family unit and

15    you're comfortable sitting closer, that's fine; otherwise

16    please maintain that distance.

17         The record will reflect that Probation Officer Heather

18    Belanger is present as well, and of course Mr. Rivera is here

19    as well.

20         Mr. Perry, has the Government provided notice to any

21    victims of the offense as required by law?

22         MR. PERRY:  It has, Your Honor.  In fact, the

23    witness is in attendance here today.

24         THE COURT:  Thank you.

25         Mr. Rivera, this is your sentencing, and so the overall
```

1    purpose of today's hearing is for me to sentence you based

2    upon your guilty plea and conviction.  I'm going to hear from

3    the lawyers and I'll hear from you as well if you wish to

4    speak, although you're not required to.

5         I'm going to be asking you and Attorney Fairfield a

6    series of questions.  The purpose of my questions are, first

7    of all, to make sure that you have read and received and

8    understand the revised presentence report that was prepared in

9    your case.  I also want to be sure there's nothing that

10   interferes with your ability to understand what's taking place

11   in court today, and then overall I want to be sure that you

12   understand the sentence that I impose and the reasons for it.

13        Now, if you don't understand a question that I ask you,

14   don't try to answer it.  Tell me that you don't understand and

15   I'll rephrase the question.  And if you wish to speak with

16   Attorney Fairfield before responding to a question, advise me

17   of that and I'll give you a chance to do so.  Please stand.

18        Mr. Rivera, are you currently taking any medications?

19             THE DEFENDANT:  No.

20             THE COURT:  Have you had any type of drugs or

21   alcohol in the past 24 hours?

22             THE DEFENDANT:  No.

23             THE COURT:  Is there anything at all that might

24   interfere with your ability to understand what's taking place

25   in court today?

```
 1              THE DEFENDANT:  No, sir.
 2              THE COURT:  Are you thinking clearly this morning?
 3              THE DEFENDANT:  Yes.
 4              THE COURT:  Attorney Fairfield, did you review with
 5      your client and discuss with him at length the revised
 6      presentence report in this case?
 7              MS. FAIRFIELD:  Yes, I did, Your Honor.
 8              THE COURT:  I take it you had sufficient time for
 9      that?
10              MS. FAIRFIELD:  Yes, I did.
11              THE COURT:  Are you satisfied that he understands
12      it?
13              MS. FAIRFIELD:  I am.
14              THE COURT:  Mr. Rivera, did you read the presentence
15      report?
16              THE DEFENDANT:  Yes.
17              THE COURT:  Have you had sufficient time to discuss
18      it with your lawyer?
19              THE DEFENDANT:  Yes.
20              THE COURT:  Do you feel that you understand it?
21              THE DEFENDANT:  Yes, sir.
22              THE COURT:  Attorney Fairfield, are there any
23      objections to the report at this time?
24              MS. FAIRFIELD:  No, thank you.
25              THE COURT:  Mr. Rivera, do you have any objections
```

1    to the report at this time?

2           THE DEFENDANT:  No, sir.

3           THE COURT:  And so as far as you know is the

4    information to your personal knowledge in the report true?

5           THE DEFENDANT:  Yes.

6           THE COURT:  All right, thank you, you can be seated.

7       Mr. Perry, I'll hear from the Government on the matter

8    of sentence.

9           MR. PERRY:  Thank you, Your Honor.  As a preliminary

10   matter, I want to have the victim impact statement admitted

11   into evidence under seal.

12          THE COURT:  All right.  I take it there's no

13   objection?

14          MS. FAIRFIELD:  No, thank you.

15          THE COURT:  All right.  It is admitted.

16          MR. PERRY:  And also, Your Honor, for completeness,

17   I'm also introducing into this sentencing the same eight

18   exhibits that were introduced in the -- Exhibit 1 is the text

19   messages from an excerpt of a search warrant affidavit; 2 is

20   the picture of the shotgun blast through the door.  Exhibits 3

21   through 8 are video snippets of events that transpired on

22   May 11th, 2019.

23          THE COURT:  Any objection?

24          MS. FAIRFIELD:  No, thank you.

25          THE COURT:  All those exhibits are admitted.

1          MR. PERRY:  Thank you, Your Honor.

2          Your Honor, the -- and I don't want to belabor it

3     because I know we got started late and the Court has heard my

4     presentation on the nature and circumstances of the offense,

5     but I'm going to talk a little bit about the nature and

6     circumstances of the offense through the prism of this

7     defendant because I think he is a little different than the

8     other two defendants because he was clearly the mastermind who

9     set this all together.  And more importantly, he's the one who

10    earned the trust of the victim to be able to get in the

11    victim's house under the auspices of the ruse of socializing,

12    hanging out, and with that trust then tricked the victim into

13    putting his dog away, to getting in the hot tub so he was in a

14    position of complete vulnerability, and then when he was the

15    most vulnerable this defendant had unlocked the door and tells

16    them now, we have those text messages, now, and we know the

17    now is the sign to Eric Mercado and Steven Hardy to come

18    crashing through the door with guns drawn, and the video shows

19    them jacking up the shotgun.

20         So obviously -- and then we know what transpired after.

21    Mr. Rivera was not part of that because he was the mastermind;

22    he -- he didn't do the dirty work.  He had Mr. Mercado and Mr.

23    Hardy to do the dirty work.  We know from the video that Mr.

24    Rivera quickly gathers his stuff and leaves because he wants

25    to make it look like he was part of -- part of the -- you

1  know, being victimized; he didn't want to make it look like he

2  was part of the conspiracy.  But very quickly after this all

3  transpired it was obvious he was in on it and he was quickly

4  apprehended shortly thereafter the -- the robbery.

5      But he is as responsible for what happened as if he were

6  carrying the gun.  He knew -- he knew they were carrying guns.

7  He knew they were carrying guns because he -- the guns had

8  absolutely -- had actually been obtained in a prior home

9  invasion which he conducted.  And so he knew exactly what

10  the -- these people were going to do with the guns.  This is

11  what he -- this was not his first time at the rodeo, so to

12  speak.

13      And so, even though he didn't pull the trigger for the

14  9mm that put the bullet in the kitchen window -- the kitchen

15  sill and that he's not the one who shot the shotgun through

16  the bathroom/bedroom door, he's as responsible under the law

17  as if he had.  And the serious -- and we talked about it

18  yesterday, the brazenness of this robbery, the fact that there

19  was an utter disregard for the well-being and safety and life

20  of the victim, just calls for an incredibly serious sentence

21  because it -- it just shows an utter disregard for life, and

22  that the sole reason they were doing this was greed.  They

23  were doing this for money.  And because they -- they weren't

24  happy or unwilling to earn money like the rest of society

25  does.

 1          So then we turn to the history and characteristics of

 2     the defendant, Your Honor, the other factor under -- one of

 3     the other factors under 3553.  And this is where this case

 4     gets very complicated because obviously he's a Criminal

 5     History Category IV based on his three prior events.  And

 6     based on our discussion prior to the sentencing, Your Honor,

 7     about the Court wanting the parties to address whether there's

 8     an overstated criminal history because he only has three

 9     convictions that result in eight points, and that is an

10     unusual dynamic.

11          Looking at the three offenses, I think all the offenses

12     appropriately get the numbers they should.  I know defacing a

13     gravestone on its surface makes it look like it's not a

14     serious enough crime, but if you look at it there were 87

15     counts and he received jail time because of violation of

16     probation.  So it was not like a one-time little vandalism.

17     This was a large scale and historic gravestones.

18          Where I think there may be an argument to vary down

19     based upon an overstated criminal history is the age of the

20     prior convictions.  They were all -- I mean, the first one's

21     when he was 18, it clearly -- what I would consider to be

22     just -- it factored into the stupid category of crimes.  He's

23     drunk; he's at a graveyard; he vandalizes the gravestones.

24     That's -- that's different, obviously, than the current crime

25     where it's premeditated and violent.  And so there -- there --

1  given his age, given the nature of the offense.  And then the

2  other two were also before he was 20.  In this offense he's

3  28, I believe, or maybe even 30.  There's a large gap between

4  his last conviction and this present offense.  And so I can

5  see, given the nature of those prior offenses, the gap in any

6  criminal convictions and this, that there's a basis for the

7  Court to say his criminal history is overstated by one

8  category.  I -- the Government would differ to a degree, but

9  this is clearly one where I see reasonable people could

10  disagree reasonably and conclude that it does overstate his

11  criminal history.

12       He obviously has been a -- he's got an employment

13  history; he's got his family here.  Many, many times in the

14  courtroom, Your Honor, as the Court is aware, there's nobody

15  here in support of the defendant.  So he obviously has a

16  family that loves him, that supports him.  And so he obviously

17  has got that redeeming quality.

18       In addition, the things we discussed, Your Honor, prior

19  to beginning in court here today, we do believe that the Court

20  should give serious consideration to those history and

21  characteristics of the defendant in determining what's an

22  appropriate sentence.  The fact that we're not talking about

23  them here in court does not mean we want to diminish those.

24  We think that that is a serious consideration that the Court

25  should give in determining whether that information shows that

 1   his history and characteristics warrant a sentence at the low

 2   end of the guidelines or a variance.

 3        In determining where we think an appropriate sentence

 4   is, Your Honor, I thought long and hard about the dynamic that

 5   was raised yesterday, and that was sentencing disparity or

 6   unwarranted sentencing disparity.  And we've laid out to the

 7   Court the reasoning why Mr. Rivera was not charged with a

 8   mandatory minimum, but we believe that, even with not being

 9   charged, the Court -- he ends up in a guideline range where we

10   think 3553 sentence is appropriate.  Just the -- all basically

11   by not charging the 924(c) for this defendant, we didn't tie

12   the Court's hands saying you can't go below 120.  Now the

13   Court can go below 120.  The guidelines say not; the guideline

14   range is above 120, even if the Court were to vary downward

15   based on his overstated criminal history.

16        We believe that an appropriate sentence for this

17   defendant, though, should take into consideration parity with

18   the other defendants and then factor in some unique things

19   about this defendant.  And in doing that my analysis -- and I

20   rephrase it based upon the assumption that the Court may vary

21   down by overstated criminal history and, if that were the

22   case, his range would have been 190 to 207, if he had been

23   charged exactly like Mr. Mercado.  And that's why he is the

24   most similarly situated because they were both clearly leaders

25   of this offense.

```
 1            For unique reasons of his history and characteristics, I
 2   think a variance could be found by the Court, and I think an
 3   appropriate level of that would be about 25 percent from the
 4   low end of the guidelines, which by my math is about 40
 5   months, 45 months, maybe, and so a sentencing range -- which
 6   would put him in the range of 140 to 145.  I believe for all
 7   the reasons and all the information made available to the
 8   Court that that's a reasonable sentence in this case and is
 9   the one most appropriate under 3553, Your Honor.
10            THE COURT:  Thank you, Mr. Perry.
11       Attorney Fairfield.
12            MS. FAIRFIELD:  Thank you, Your Honor.
13            THE COURT:  Before Attorney Fairfield speaks, let me
14   remind everyone in the courtroom of the Court's general order
15   requirement that anyone that is not vaccinated must wear a
16   mask.  Anyone who is vaccinated is not required to wear a mask
17   but you're free to wear a mask if you wish.
18       Attorney Fairfield?
19            MS. FAIRFIELD:  Thank you, Your Honor.
20       I will start out with saying that I agree with Attorney
21   Perry as to the criminal history being overstated by the three
22   convictions, the two level threes and the one level two.  And
23   I certainly appreciate and endorse his suggestion that his
24   criminal history is overstated and he should actually be at a
25   Level III.  I think the guideline is 135 to 147.  So that is
```

1    where I'm requesting the starting point -- I'm sorry, 135 to

2    168, I'm close, is -- is what Ms. Belanger figured out.  So I

3    would ask that that be imposed as a variant sentence in terms

4    of his criminal history, and the base that I just described

5    that will be my starting point.

6        As far as Nathan's -- the characteristics of Nathan, as

7    Mr. Perry pointed out, he's got a family out here who has been

8    here quite a bit.  In back of me are his mom, Audrey, his

9    niece Anyah, and his niece Annaleisse.  Nathan has known --

10   Annaleisse is the older child.  He has known her since her

11   days at the hospital.  He changed her diapers.  He assisted

12   his sister, Annaleisse's mom, in caring for her at a very

13   young age because unfortunately she was born with some muscle

14   atrophy that has gotten worse over time.  But they've been

15   bonded since Annaleisse was born and Nathan has become kind of

16   her person, if you will.  Unfortunately, their mom Nina is in

17   and out, but Nathan and his sister are very close and the kids

18   are very close with their mom.  But Nathan and his mom Audrey

19   have been the constant.

20       Audrey talks about how central Nathan is and without him

21   Annaleisse won't be able to do fun things outside of the

22   house.  Essentially with her condition now she's relegated to

23   a wheelchair and it's hard to get around with her.  And Nathan

24   was always good for fun times with Annaleisse and she's always

25   looked forward to her time with her Uncle Nathan.  They do

1    things like go go carting, he takes her to carnivals and

2    festivals, and essentially tries to normalize her life as much

3    as he possibly can.  They've -- Audrey told me about a time

4    where they just went driving around and they bought a bunch of

5    pizzas and went and delivered them to the area homeless

6    shelter where they live down in Tyngsborough, and Audrey

7    describes how Nathan just always tried to instill good

8    community ethics in her just by caring for your fellow man.

9        Despite why we're here, Your Honor, Nathan Rivera has

10   one of the biggest hearts.  It's the antithesis of what

11   occurred back in May of '19.  He's always looking out for his

12   fellow person, his fellow family member, and just trying to

13   make people's lives a little bit easier.  His mom describes

14   that he's always had just an incredible work ethic, and he --

15   every storm, every time the grass would grow around the

16   neighborhood, Nathan could be found mowing lawns or shoveling

17   snow for the most vulnerable, the elderly persons that have

18   disabilities throughout the neighborhood, and he would just do

19   this of his own big heart.  So he is somebody who does care

20   about his fellow man.

21       He is an incredibly hard worker in the sense that he was

22   going to school, he had a couple jobs, and he actually started

23   his own company while he was out on bail.  He took college

24   courses toward becoming an electrician, and he worked to -- to

25   build up sort of a home repair type with an emphasis on

1    electricity but he's still in the training for that, and he

2    was licensed by the Commonwealth of Massachusetts to do

3    certain home repair jobs.  So he worked hard in a short amount

4    of time and accomplished quite a bit.  He was accepted to

5    college, accepted to apprentice programs, and had no trouble

6    getting hired because of his strong work ethic.

7         What Audrey describes, when I say -- you know, you look

8    at this guy and he's just got a great heart, and what was he

9    thinking?  And because of Nathan's big heart, what he always

10   declared for his mom, I just want to make sure that you have a

11   home, I need to get you a home, Mom.  I'm afraid if something

12   happens to you, you've got the two babies, Annaleisse, I need

13   to make sure that you guys are not homeless.  Now, that in no

14   way, shape, or form condones anything about what occurred in

15   May of '19 to the victim or the town of York but most

16   importantly the victim.  But it gives you a glimpse into where

17   his priorities seem to be in terms of his family.  And the

18   thinking here is there a bound.  But he is somebody who is a

19   decent human who knows hard work and has made some really poor

20   decisions along the way.

21        But he is redeemable, as is evidenced by his family

22   here.  There is -- he -- he does ask for help.  I provided the

23   Court with some letters and a certificate -- I'm sorry, not a

24   certificate, a letter from Maine Pretrial that talks about

25   Nathan's engagement in substance abuse while he was at the

1    jail.  He did not have the greatest attendance while he was

2    out on bail, but I think -- I think the takeaway from that in

3    speaking with Nathan and understanding kind of how things

4    were, he was back-to-back-to-back jobs when he was out, and

5    he -- I think he always made his appointments with the best of

6    intentions, but he just -- he didn't prioritize them.  He

7    didn't -- he prioritized work and providing for his mom and

8    nieces above himself.

9        When he is in a structured setting, he's doing really

10    well with the program with the treatment and counseling that

11    is being offered there.  So I -- although I know he's

12    disappointed in himself that he didn't make a go of it in the

13    community as much as he should have, he is really trying to

14    avail himself of every program he can avail himself of while

15    in custody.

16        Toward that end he has asked me to ask Your Honor, he

17    would like to do the RDAP program.  He also believes that Fort

18    Devens would be a good fit for him for proximity to his house.

19    And my cursory review of that, I think if Bureau of Prisons

20    were willing to look into that or put him there, I think that

21    achieves his ends.  But certainly it's not ultimately up to

22    everyone in this room.  So that is his wish going forward.

23        For all of the reasons we talked about and the special

24    characteristics of Nathan, with a starting range of 135, I am

25    starting at the low end of that number, I would ask the Court

1    to impose somewhere between a 60- and 80-month sentence.

2         And I believe -- if I could have just one minute, I

3    believe my client would like to address the Court.

4              THE COURT:  Thank you.

5              (Defendant conferred with counsel.)

6              THE COURT:  Mr. Rivera, actually you should stay at

7    counsel table, please.

8              THE DEFENDANT:  Sorry.

9              THE COURT:  There's a microphone right there.  And I

10   want to formally advise you that as a defendant who's about to

11   be sentenced you have a constitutional right to speak to me at

12   this time, but you're not required to speak.  It's only if you

13   wish to speak.  Do you wish to speak?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  Please go ahead.

16             THE DEFENDANT:  Very often is it the crisis

17   situation that actually improves us as human beings.

18   Paradoxically while these instance sometimes ruin people,

19   they're usually growth experiences.  As a result of such

20   calamities, the person often makes a major reassessment of his

21   life situation and changes it in ways that reflect a deeper

22   understanding of his own capabilities, values, and goals.

23             THE COURT:  Mr. Rivera, I'm going to interrupt for

24   just a moment.  Because we're having this transcribed, I'm

25   going to ask you to slow down a little bit in your speech to

1    make sure that we get every word.

2              THE DEFENDANT:  Okay.  So do you want me to reread

3    it?

4              THE COURT:  No, you can continue on, thank you.

5              THE DEFENDANT:  Sorry.  This is quoted from a study

6    I read by Dr. Richard Farson about the psychological

7    abnormalities caused by traumatic experiences.  It made all

8    the sense in the world to me because over the last six years

9    of my life I faced multiple adverse situations, each one

10   persevering and learning not only more about myself but the

11   damage I've caused other people.  I'm sorry.

12        I just want to start by saying I'm sorry to not only

13   Mr. Sostak but his family, because in reality this man did

14   trust me and even the week leading up to what had happened

15   that night, me and him, you know, talked through text and got

16   to know each other a little bit and he, you know, acknowledges

17   the fact that I was an apprentice electrician, I know he's a

18   licensed electrician, and he offered to teach me more about

19   the trade and help me out.  Even the night that it happened,

20   he even offered me a job with him, you know, at his company

21   to, you know, learn how to wire things and, you know what I

22   mean, help me out in my career.

23        You know, I know at one point, you know, I tried to back

24   out of this whole situation because in actuality I knew it was

25   wrong.  You know, regardless of my history and the poor

1  choices I've made in my past, I don't believe I'm a bad person

2  and I do have a heart.  And I really couldn't be more sorry to

3  this man for what I allowed to happen that night.  He is a

4  good person and me and him talked that night, he told me about

5  his two daughters and how he's the -- he's a major factor in

6  their life.  And I told him about, you know, my two nieces,

7  how I don't see them as anything less than my daughters.  You

8  know, I -- I've taken responsibility for them and I raised

9  them as my own, and they don't see me as nothing less than a

10  father figure to them.

11      You know, and the fact that I broke this man's trust and

12  I caused him so much problems in his life along with, you

13  know, his family and like considering trust.  And, you know,

14  what I did was wrong, Your Honor.  I'm sorry, I'm just really

15  nervous so it's hard for me to speak right now.  But, you

16  know, I take full responsibility for what happened that night

17  because in actuality if it wasn't for me that would have never

18  happened.  I never thought it would go that far or things

19  would go that way.  And at the end of the day I am responsible

20  regardless.

21      You know, my family means the world to me and a lot of

22  things I've done in my life, regardless how wrong they were,

23  in whatever way I can justify it by -- I only really try to

24  have the best intentions to help my family.  You know, I grew

25  up in poverty, my mom struggles every day, you know, and it's

1    like I just honestly, as stupid as it sounds, I -- the -- the

2    sound of, you know, being able to finally buy her a home and

3    do more for them and like, you know, try to get out of that

4    lifestyle finally, and it definitely was tempting and it was

5    selfish of me to try to take the easy way out rather than just

6    being a man and working hard for it like I should have.

7        I'm sorry, I -- I don't really know what to say right

8    now.  It's just -- it kills me the fact that I'm sitting here

9    right now rather than being home and supporting my family, you

10   know, like especially in a time of need right now.  And I just

11   lost my father two months ago while sitting in a jail cell,

12   you know.  I can only imagine what other family I'm going to

13   lose and knowing -- hearing the issues from my family at home,

14   like, you know, I was talking on the phone the other day with

15   my little sister and I asked her why you haven't brought

16   Annaleisse to the beach or, you know, the lake or anything.

17   And she's like, nobody's here to help.  We can't physically

18   pick her up to do any things, and because of my selfish -- my

19   selfishness I'm taking away from her and her life.

20       And I took away from this man and his life as well,

21   because now he has to live with the fear and paranoia of

22   somebody breaking his trust and hurting him like the way I

23   did.  Where not only did he trust me but he tried to help me,

24   he tried to give me a way up.  And that was selfish of me to

25   take advantage of that.  And, Ryan, as much as you don't want

1    to hear it, man, I'm really sorry.  I really am, you know, it

2    was wrong of me for what I did that night.

3         That's all I really have to say for right now, I'm

4    sorry, man, my anxiety is through the roof, and I never

5    thought I'd face something this serious in my life and -- I

6    don't know.

7              THE COURT:  Thank you, Mr. Rivera.

8              MS. FAIRFIELD:  If I could have just one moment.

9              THE COURT:  Yes.

10             MS. FAIRFIELD:  Thank you.

11             THE COURT:  Amy?

12         (The Court conferred with the case manager.)

13             MS. FAIRFIELD:  Your Honor, this is Audrey Rivera,

14   Nathan's mom.

15             THE COURT:  All right, Ms. Rivera, if you'll state

16   your first and last name and spell both, please, for the

17   record.

18             MS. RIVERA:  Audrey Rivera, A-U-D-R-E-Y,

19   R-I-V-E-R-A.

20             THE COURT:  I'm going to ask you to step to your

21   left, thank you.  There you go.  Please go ahead.

22             MS. RIVERA:  Excuse me, I'm nervous.

23             THE COURT:  I understand.

24             MS. RIVERA:  I know what he did was wrong, but he

25   does have remorse.  He's got a good heart.  And it's really

1    hard at home without him because he's -- he is the father

2    figure for those kids.  He's the one who helps me.  They lost

3    their dad two years ago, and he was like a brother to Nathan.

4    You know, I had custody of him at one point.  They grew up

5    together.

6         And unfortunately my daughter and him were drug addicts,

7    so we raise -- we're raising the kids and Nathan is there from

8    day one.  From the day Annaleisse was born, he always was

9    there taking care of her, and he was a good son and he's a

10   hard worker.  I just ask that you have, you know -- have

11   mercy.  My grandchildren most of all, especially Annaleisse.

12   It's really hard to do anything without him.

13        I just love my son so much and I'm sorry for what he did

14   and I know he's sorry.  Just, you know, my heart is so broken

15   right now, I don't even know what to say except for I love my

16   son and I just ask that you please take into consideration my

17   grandchildren, because it's just me and my youngest daughter

18   taking care of them.  We have nobody else to help us.  Nathan

19   was it.  You know, he was always there.  He did everything I

20   couldn't and I can't do.  You know, I have my own health

21   issues.  I can't.

22        And he's a good boy and he's a hard worker and he's

23   always trying to improve himself.  He always trying to go to

24   school and do something better for himself, you know, even

25   though he did bad but his good outweighs his bad in my eyes

1    anyways, because I see what he's doing and he suffered a lot

2    of trauma and loss in his life, you know, and he's trying and

3    I know what he did was wrong.  But please have mercy on my

4    son, please, for my grandchildren.

5              MS. FAIRFIELD:  Thank you.

6              MS. RIVERA:  Thank you.

7              THE COURT:  Thank you, Ms. Rivera.

8              THE DEFENDANT:  I'm sorry, Mom.

9              MS. RIVERA:  I love you.

10             THE DEFENDANT:  I love you, too.

11             MS. FAIRFIELD:  Thank you, Your Honor.

12                        (Counsel conferred.)

13             MS. FAIRFIELD:  As a housekeeping matter, Your

14   Honor, I would like to introduce and admit the exhibits that

15   were provided for sentencing purposes.

16             THE COURT:  Any objection?

17             MR. PERRY:  None, Your Honor.

18             THE COURT:  All the exhibits the Court has received

19   from the defendant in relation to the sentencing are admitted.

20             MS. FAIRFIELD:  Thank you.

21             THE COURT:  Anything further, Attorney Fairfield?

22             MS. FAIRFIELD:  No, thank you.

23             THE COURT:  All right, counsel, I'm going to take a

24   brief recess.  I want to reflect on the arguments that you've

25   made.  We'll be in recess for approximately 10 minutes.

```
 1              (A recess was taken from 11:53 a.m. to 12:09 p.m.)

 2              THE COURT:  In preparation for today's sentencing I

 3    did review all the exhibits submitted by both the Government

 4    and Mr. Rivera.  They have been made part of the record of

 5    this.  In addition, I've considered carefully the revised

 6    presentence investigation report, which I'm now adopting in

 7    its entirety as my findings in support of the sentence that

 8    I'm about to impose.

 9              As reflected in the report, I now want to turn to the

10    applicable provisions of the guidelines, sentencing

11    guidelines.  The total offense level for the defendant's

12    offense is 31, and his criminal history category is IV under

13    the guidelines.  This results in a sentencing range of 151 to

14    188 months, a period of supervised release of one to three

15    years, a fine range of 30,000 to 250,000 dollars, and Mr.

16    Rivera's ineligible for probation under the guidelines.

17              Counsel, any objection to the summary I've just provided

18    regarding the guidelines in this case?

19              MR. PERRY:  No, Your Honor.

20              MS. FAIRFIELD:  No, thank you, Your Honor.

21              THE COURT:  In addition to the report and the

22    exhibits, I have of course listened carefully to the arguments

23    of the attorneys today, as well as Mr. Rivera's allocution, as

24    well as the statement made by his mother, and all the other

25    materials that the parties have provided me in connection with
```

1    today's hearing.

2        In addition to the guidelines and all that information

3    I'm of course also considering the sentencing factors that are

4    recognized under federal law.  And these include the nature

5    and circumstances of the crime; Mr. Rivera's personal history

6    and characteristics; the need for the sentence that I impose

7    to reflect the seriousness of the offense, promote respect for

8    the law, and to provide just punishment; the need to protect

9    the public from further crimes by the defendant; the need to

10   provide a defendant with required educational or vocational

11   training, medical care, or other correctional treatment in the

12   most effective way; and the need to avoid unwarranted

13   sentencing disparities.  That last point is particularly

14   relevant here given the fact that Mr. Rivera is one of several

15   co-defendants who are being sentenced for this offense.  I've

16   considered all of those factors.

17       Mr. Rivera has previously pled guilty to the charge in

18   this case, which is conspiracy to commit a Hobbs Act robbery,

19   and he now stands convicted of that offense.

20       I want to turn now first to the offense conduct.

21   There's no dispute as to what happened here.  Mr. Rivera was

22   the spark, the idea man, behind the notion of performing a

23   home invasion against an individual who lives in York, Maine.

24   He communicated first with Mr. Mercado and then others who

25   over the course of two days plotted the home invasion,

1    targeting someone who they believed would be in possession of

2    contraband and a large amount of cash and other valuables.

3        In keeping with the plan, Mr. Rivera and two women

4    entered the residence under the pretext of socializing with

5    the owner.  The four ended up in the hot tub, and after Mr.

6    Rivera surreptitiously unlocked the front door to the

7    residence he signaled to Mr. Mercado and Mr. Hardy, now, in

8    other words, time for them to enter and perform the robbery.

9    Mr. Mercado was armed with a 12 gauge shotgun; Mr. Hardy was

10   armed with a handgun.

11       The victim, who is present in court today, had the

12   presence of mind to essentially handle himself in such a way

13   as to get out of the hot tub, get back into the house, and

14   then finally escape.  In the process both Mr. Hardy and Mr.

15   Mercado discharged their weapons at the victim, but he

16   successfully fled, really quite remarkable.

17       With the plans having now blown up, both Mr. Mercado and

18   Mr. Hardy of course ultimately ran, as did Mr. Rivera and the

19   two women, co-conspirators.  And so that ended what was in the

20   end a botched Hobbs Act robbery.

21       Mr. Rivera is -- has received criminal history points --

22   I'm sorry, rather, offense points under the guidelines as

23   being a leader/organizer of this conspiracy, which he was.

24   The Government has characterized him as the mastermind; I'm

25   not sure that mastermind is entirely appropriate.  He

 1    certainly was the instigator of the conspiracy.  But based

 2    upon the information I've received it seems to me that Mr.

 3    Mercado was the primary mover in terms of the design and then

 4    execution of the event.  In any event, Mr. Rivera bears great

 5    culpability and responsibility for giving birth to this

 6    horrendous crime.

 7         As we described it already in court, it was a crime that

 8    was brazen; it showed a total indifference to the value of

 9    human life.  Whether or not the discharge of the firearms was

10    ever discussed ahead of time, it was certainly known to Mr.

11    Rivera and the others that the reason why they were entering

12    with armed weapons was to possibly use them, if needed, to

13    achieve their purpose.  And so a crime such as this has to be

14    condemned in the strongest terms, particularly motivated as it

15    was by greed.

16         Turning to the factors associated with Mr. Rivera

17    himself, today he's before the Court at the age of 30; when he

18    committed this offense he was age 28.  He had extensive

19    involvement with the criminal justice system as a juvenile and

20    he grew up in a neighborhood, in an area, and under conditions

21    which was rife with gang activity.  He had a difficult

22    childhood, he lacked parental supervision, and so

23    unfortunately he became involved in drugs and alcohol at a

24    young age.  And then into his adulthood he continued to be

25    involved, and that's reflected in his conviction history,

1   which I'll discuss more in just a moment.

2        I want to add, though, that along the way Mr. Rivera did

3   show signs of a potential for leading a more positive life.

4   He earned his GED, he studied electrical work, and he

5   maintained employment at times, earning praise and supporting

6   himself earning money legitimately and not through crime.

7        Furthermore, I take as true and I accept all the

8   representations that have been made regarding his acceptance

9   of essentially parental responsibility for his nieces,

10  something which he did at a relatively young age, providing

11  substantial care for the family.  And even the idea that this

12  crime was motivated in part by those instincts to care for

13  family, of course it offers simply no justification, but that

14  seems to be part of the mix for Mr. Rivera as to how he got

15  himself into this terrible mess that he's in.  But his

16  deprived childhood and his lack of guidance as a youth it

17  seems to me point to justification for a variance under the

18  sentencing commission guidelines.

19       Now, with respect to Mr. Rivera's criminal history, as

20  the Government -- Government's attorney has already explained,

21  it seems to me that the Criminal History Category IV does

22  overstate the seriousness of his actual criminal history for

23  the reasons articulated by Attorney Perry.  Furthermore, on

24  that point I would add that that initial conviction which

25  results in three points occurred when Mr. Rivera was 18.  So

1  he was really just at the beginning of adulthood.  And that

2  provides of course no excuse for what he did, which is the

3  desecration of a large number of gravestones of historic

4  importance.  It's a terrible crime in and of itself, but it

5  was not a violent act directed at others, nor was it drug

6  trafficking.  And it just seems to me that keeping in mind his

7  age, keeping in mind the nature of the crime, and keeping in

8  mind when it occurred relative to this offense, it results in

9  an overstatement of the seriousness of his criminal record.

10  Therefore, I am going to grant him a departure in keeping with

11  the requirements of the Guideline Section 4A1.3(b)(1), and as

12  a consequence for purposes of the guidelines his criminal

13  history category is III, not IV.

14      Now, there's another matter I'd like to discuss with the

15  attorneys at sidebar, and so for purposes of that we will use

16  the headset equipment that we have.  I'll simply caution

17  everyone that this is the first opportunity I am having to use

18  this equipment in court, and so we'll see how it goes.

19                          (Sealed)

20                          (Open court)

21      THE COURT:  Several other points relevant to the

22  determination of a fair and just sentence in this case are as

23  follows:

24      Mr. Rivera was admitted to presentence bail in this

25  case -- actually -- yes, presentence bail in this case, which

1    he voluntarily relinquished after a state matter came to the

2    attention of authorities, in particular at least one charge of

3    domestic violence assault.  The record reflects that that

4    charge remains outstanding, unresolved.  And, in any event, it

5    explains why it is that Mr. Rivera's currently in custody and

6    no longer on bail.

7         Defendant has made several other arguments with respect

8    to a variance in this case.  I would like to touch upon them

9    briefly.

10        First, the various collateral consequences that Mr.

11   Rivera will face as a person with a federal conviction.  The

12   defendant certainly makes valid points regarding the many

13   collateral consequences that he will have to experience as

14   someone with a federal record.  Nonetheless, I don't see a

15   basis to in any way to distinguish the collateral consequences

16   as they will affect his life, as they affect most people

17   convicted of federal offenses; and, therefore, I don't see a

18   basis to individualize those consequences in this case and

19   treat that as a basis for a variance.

20        With respect to the argument that he should receive a

21   variance based upon his dysfunctional early childhood and lack

22   of parental supervision, I've already touched on that, and in

23   fact I will factor that into the ultimate sentence as a

24   variance.

25        And finally, as to the request for a variance based upon

1    his current family responsibilities, it seems to me that of

2    course there's no question that his apprehension and now

3    conviction and sentence will cause great hardship to his

4    family and suffering, for that matter.  Nonetheless, I

5    conclude that it is not out of the usual realm that I see

6    families experience when an important parental figure in a

7    family is sentenced based upon a conviction.  So I don't see a

8    basis to distinguish his circumstances, and therefore I'm not

9    granting an additional variance on that basis.

10        With respect to the co-defendants in this case, I have

11    given careful thought to the sentences that were imposed with

12    respect to Mr. Mercado and Mr. Hardy.  For reasons I've

13    already stated on the record and also in particular at

14    sidebar, I find that there is certainly a good basis to

15    distinguish Mr. Rivera from those two individuals and their

16    sentences.  Furthermore, I'll point out that, although Mr.

17    Rivera had to have foreseen the threat to human life posed by

18    conspiring with others who would be armed with loaded weapons,

19    nonetheless, the role that he defined for himself in the

20    conspiracy did not involve the use of a firearm.

21        Furthermore, he, based upon my rulings, has a different

22    criminal history category than his -- than the other two

23    co-defendants who I've previously sentenced.  And so there

24    will be a disparity in sentencing in this case but I see it to

25    be fully justified and, therefore, warranted.

1          The law requires that I give consideration to what is

2     the purpose of the sentence in this case, and there's --

3     there's several obvious purposes in sentencing Mr. Rivera for

4     his participation in this Hobbs Act robbery.

5          The first is the seriousness of the offense.  This is on

6     the scale of seriousness really at or close to the top in

7     terms of the risk of harm to the victims, the effect that it

8     has on community -- a community sense of safety and

9     well-being.  This was a -- a terrible offense; I've already

10    described it as such.  I need not say more other than to note

11    that the sentence should be harsh because of its seriousness.

12         It's also to deter Mr. Rivera from further criminal

13    conduct.  He's got to understand that, whatever sentence I

14    ultimately impose today, it's going to be harsh; but if he

15    comes out of federal prison and finds himself back into the

16    criminal justice system, he's already demonstrated to me that

17    he's an articulate individual and therefore is capable of

18    understanding what that would mean for him and his family if

19    he were to ever be convicted of a crime again and find himself

20    in front of a judge like me.  So deterrence is very important.

21         Furthermore, I do find that Mr. Rivera is an individual

22    who is in need of training and proper effective correctional

23    treatment.  There's no way to know what ultimately will be

24    made available to him in the Bureau of Prisons, but things

25    might be made available to him.  Anything that puts Mr. Rivera

1    on a footing when he comes out that he has at that point the

2    maturity, the sense of self-restraint, sobriety, to get out

3    and live a peaceful and decent, productive life will be an

4    effort worth taking.  And so it seems to me the sentence needs

5    to be long enough to allow for that to occur, because that

6    does occur for some, not all, but for some who are in the

7    custody of the Bureau of Prisons.

8        Counsel, is there any aspect of your sentencing

9    arguments I have not addressed that needs to be addressed,

10   Mr. Perry?

11        MR. PERRY:  No, Your Honor.

12        THE COURT:  Attorney Fairfield?

13        MS. FAIRFIELD:  No, thank you, Your Honor.

14        THE COURT:  Thank you.  Mr. Rivera, I'd ask that you

15   stand at this time.

16        Based upon all these considerations and in consideration

17   of the adjustments that I've made to the applicable provisions

18   of the sentencing guidelines, based upon the rulings that I've

19   now expressed on the record, I conclude that a just and fair

20   sentence that is sufficient but not greater than necessary to

21   achieve the purposes that I've just articulated is as follows:

22        I'm committing you to the custody of the U.S. Bureau of

23   Prisons for a total term of 97 months.  I'm going to recommend

24   to the Bureau of Prisons that you be incarcerated at Fort

25   Devens in Massachusetts or as close to the Lowell,

1  Massachusetts, area as is available so that you'll be near

2  your family and be able to benefit from their contact and they

3  will be able to benefit from their contact with you.  I see

4  this as critical to your rehabilitation.  Furthermore, I'm

5  recommending that you be considered for the 500-hour RDAP

6  treatment program in the Bureau of Prisons.  And at the

7  conclusion of this sentencing hearing you're remanded to the

8  custody of the U.S. Marshal for the District of Maine in

9  furtherance of this sentence.

10        Upon your release from prison I'm ordering that you be

11  on a period of supervised release for three years.  I'm

12  imposing all of the standard, mandatory, and special

13  conditions of supervised release set forth in the revised

14  presentence report.

15        Attorney Fairfield, did you review those with your

16  client?

17            MS. FAIRFIELD:  I did.

18            THE COURT:  Are you satisfied that he understands

19  them?

20            MS. FAIRFIELD:  I am.

21            THE COURT:  Is there any objection to any of them?

22            MS. FAIRFIELD:  Not -- no.

23            (Defendant conferred with counsel.)

24            MS. FAIRFIELD:  We're fine with those, thank you.

25            THE COURT:  Thank you.

1        Mr. Rivera, you did review those conditions with your

2    lawyer; is that correct?

3                THE DEFENDANT:  Yes, sir.

4                THE COURT:  Do you feel that you understand them?

5                THE DEFENDANT:  Yes, sir.

6                THE COURT:  And do you have any objection to any of

7    them?

8                THE DEFENDANT:  No, sir.

9                THE COURT:  I'm imposing a special assessment of

10   $100.  I am not imposing a fine because I conclude that Mr.

11   Rivera does not have the financial means to pay a fine.  I am

12   ordering Mr. Rivera to pay restitution joint and several in

13   the amount of $3,740 as set forth in the revised presentence

14   investigation report.  That is to be without interest.

15       The record should reflect that I've carefully considered

16   all of the arguments that have been presented regarding the

17   guidelines in this case as they affect the defendant's offense

18   level and criminal history category.  I want to make the point

19   that, even if I had accepted an argument that I have not

20   accepted, the sentence I would impose today would be the same,

21   untethered from the guidelines; that is, based upon the

22   3553(a) sentencing factors I'm satisfied that the sentence

23   that I've now articulated is just, fair, and appropriate.

24       And, finally, counsel, is there any aspect of the

25   sentence I have not addressed that needs to be addressed

1    before I advise Mr. Rivera of his rights of appeal?

2              MR. PERRY:  No, Your Honor.

3              MS. FAIRFIELD:  No, Your Honor, thank you.

4              THE COURT:  Thank you.

5         Mr. Rivera, in keeping with your plea agreement, you

6    waived the right to appeal from any aspect of your guilty plea

7    or conviction and also to appeal from any sentence that did

8    not exceed 60 months.  The sentence that I have now imposed

9    does exceed 60 months, and therefore you have a right to

10   appeal from your sentence in this case.  I'm not aware that

11   you have any other rights of appeal, but in the event federal

12   law might recognize any, what I'm about to tell you would

13   apply to that, too.

14        If you wish to appeal, to exercise that right you must

15   file with the clerk of court a written notice of appeal within

16   14 days of today or else you'll have waived that right.  Do

17   you understand?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  And if you can't afford to appeal, you

20   have the right to request the clerk to file the appeal for you

21   without charge; again, that written request has to be received

22   within 14 days.  Do you understand?

23             THE DEFENDANT:  Yes, sir.

24             THE COURT:  To conclude, Mr. Rivera, I take your

25   expressions of remorse as being sincere.  And in my comments

1    I've tried to highlight what I perceive to be reasons to be
2    hopeful that in fact you have the potential to turn your life
3    around once you put all this behind you.  It's critically
4    important that you use your time in Bureau of Prisons
5    positively, meaningfully, productively, and come out of that
6    experience ready to take on the responsibilities of adulthood
7    and life.  For the reasons I've already explained, I see that
8    you have that potential and I hope that you see that potential
9    in yourself.  You say that you do.  I hope that you really do.

10         It's very important to me that your family's here today.
11   Your nieces are here today.  They've gotten to witness their
12   uncle going through what is for you, of course, a really
13   tragic experience now in terms of its impact on your life
14   overall.  But more importantly, they're here to and will have
15   memories of what occurred today and what you said, what I got
16   to say, the fact that there was a victim here in court.  This
17   is part of their life, a big part of their life now.  It will
18   remain so because you're going to be absent.  But someday
19   you're going to be back, and what you do with that is going to
20   make all the difference in their lives.  What they take from
21   the justice system, what they take of you, your character.

22         So I just want to emphasize that, Mr. Rivera, as bad as
23   things are, based upon what you've done, you do have now the
24   potential to turn this around, take the long view -- you've
25   got a long life ahead of you -- take the long view, do

1   whatever it takes to find yourself in a position 10 or 20

2   years from now where you can be proud of what you've achieved

3   and, more importantly, your nieces can be proud of what you

4   achieved.  So that's the potential, that will be -- that will

5   be the real justice for the victim in this case and for the

6   public if you do in fact turn your life around.  That's what

7   we want.  So good luck to you.

8               THE DEFENDANT:  Thank you, sir.

9               MS. FAIRFIELD:  Thank you.

10              THE COURT:  I want to thank the attorneys for all

11  their efforts in this case.  I do want to thank Probation

12  Officer Heather Belanger as well.  Unless there's anything

13  else, counsel?

14              MR. PERRY:  Nothing further, Your Honor, thank you.

15              MS. FAIRFIELD:  No, thank you, Your Honor.

16              THE COURT:  All right.  And Case Manager Spencer,

17  anything we haven't addressed that needs to be addressed?

18              THE CLERK:  No, Judge Levy, thank you.

19              THE COURT:  We are now adjourned.

20                   (Time noted:  12:42 p.m.)  l

21

22

23

24

25

1          **C E R T I F I C A T I O N**

2     I, Lori D. Dunbar, Registered Merit Reporter, Certified

3     Realtime Reporter, and Official Court Reporter for the United

4     States District Court, District of Maine, certify that the

5     foregoing is a correct transcript from the record of

6     proceedings in the above-entitled matter.

7     Dated:  January 11, 2022

8                    /s/ Lori D. Dunbar

9                    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25